\*DUNCAN MCARTHUR *v.* SARAH PORTER, WIDOW, AND OTHERS. [99

Where the vendor of a tract of land, having a lien for the purchase money, obtains a judgment, upon which the land is sold for a sum sufficient to pay the whole amount, the lien does not pass to the purchaser of the land, so as to enable him to set it up against the widow's estate of dower, but is extinguished by the sale on execution.

THE substance of the case made in the bill and answers, is this : In May, 1797, George Porter, then being unmarried, purchased of Nicholas Talliaferro, part of an entry for land standing in the name of Talliaferro, and gave his bond for the purchase money, reciting that it was given for the purchase money of the land, and specifying that the land was to be held as a security until the bond was taken up.   Porter obtained an assignment of the entry and warrant from Talliaferro, had a survey executed, and in August, 1797, obtained a patent in his own name.   In April, 1798, he married the defendant, Sarah.   In September, 1801, George Porter deceased, and administration upon his estate was granted to Peter Porter.   The bond given to Talliaferro not being paid, suit was brought on it against the administrator in the general court of the territory, and at October term, 1802, judgment was rendered and execution awarded.   The writ of execution commanded the sheriff to make the debt, charges, and costs of the goods and chattels remaining in the hands of the administrator, and for want of such goods and chattels, to make the same of the lands and tenements.   Upon this writ, the sheriff returned that there were no goods, and a levy upon four hundred and fifty-two acres of land, condemned to be sold by a jury of twelve men, and not sold for want of bidders.   There were, in fact, no goods.   Upon a subsequent execution, the land was sold by the sheriff to the complainant for the sum of $1,521.   The money was paid to the sheriff, and on the 19th December, 1803, the sheriff made the complainant a deed.   The judgment was satisfied, and the balance of the money paid over to the administrator, and the complainant obtained possession of the land.

The defendant, Sarah, prosecuted her writ of dower against complainant, and recovered judgment for one-third of the prem-

ises, and for damages at the rate of thirty-five dollars per year from September, 1802. The bill prayed a perpetual injunction, upon the ground that the bond for the purchase money, under which it was sold upon execution, attached as an equitable lien upon it, which was paramount to the widow's dower, so that the sale by the sheriff divested her right in equity.

100] *The bill also claimed that the complainant ought to be considered in equity as the holder of the bond of Talliaferro and the lien connected with it, and that the widow could set up no claim for dower until such lien was discharged; and that after so much of the land was sold as would discharge the lien, she should be endowed of the remainder only.

And it claimed further, that the widow ought only to be endowed of the value of the land and of the improvements, as they were at the death of her husband, not as they were when her recovery was had.

And if the court sustained the recovery of dower, it claimed of Talliaferro, who was made a defendant, that he should refund of the amount received *pro rata*, and asked a decree to that effect.

The cause was argued at great length by Scott and Grimke for the complainant, and by Brush and Ewing for the defendants.

The points discussed were:

1. Whether, under the territorial law of 1802, the lands of an intestate were subject to be sold on execution upon a judgment against the administrator alone, the heir not being a party?

2. Whether Talliaferro's bond attached as a lien, in preference to the widow's right of dower?

3. Whether the territorial courts have power, as courts of law, to set up and enforce such lien, by subjecting the widow's right of dower to the discharge of the lien or purchase money, and what proceeding should have been had for that purpose? But as the majority of the court have placed the decision of the cause upon grounds not discussed in the arguments, it is deemed unnecessary to report them, especially as they are fully noticed and considered in the dissenting opinion of Judge Burnet.

By the COURT:

The view taken of this cause by a majority of the judges, renders it unnecessary to decide upon the validity of the sheriff's sale—the existence of the equitable lien relied upon—or the

power of the territorial courts, as courts of law merely, to enforce such equitable lien. Admitting every one of these points to be decided as the complainant contends for, still he has presented no case that entitles him to the relief sought.

George Porter, the deceased, acquired, by his patent, an estate of inheritance in the lands in question. The defendant, Sarah, by her marriage with George Porter, acquired the right of being endowed in these lands, if she survived her husband. Upon his death, *this right invested her with a complete, perfect, [101 legal estate. If an equitable lien existed upon the lands for purchase money, it belonged to Talliaferro, and to no one else. As to all the world beside, her right was clear and unquestionable at. law. At the sheriff's sale the complainant did not purchase any right or interest that belonged to Talliaferro. He purchased the estate of which George Porter died seized, and nothing more. George Porter held this estate subject to his wife's claim for dower. In his lifetime, he could not, by any act of his own, discharge the estate of this claim. The sheriff could sell nothing more than what. George Porter himself could have sold. The land, therefore, was sold by the sheriff and purchased by the complainant subject to this charge of dower. The prosecution of this bill, and the arguments in support of it, seem to involve this admission. If the complainant acquired the widow's dower by the purchase at sheriff's sale, it would have availed him as a defense to the action at law. This suit would not be necessary. Where nothing but a. legal right was sold, how could he acquire an interest to be set up and established in equity? The land was sold as assets in the hands of the administrator, for the payment of the debt due of the purchase money. It sold for a sum sufficient, and the proceeds were applied in discharge of that debt. By this payment, the lien for purchase money, whatever its character or effect might be, became extinct. It never passed from Talliaferro, but perished in his hands.

Had the estate of Porter, which was assets in the hands of his administrator, proved insufficient to pay the debt, it would then. have been necessary for Talliaferro to have enforced his lien against the widow's dower estate. This could only be done by making the widow a party. Could she have been legally divested of the freehold vested in her by the death of her husband, upon the mere suggestion of an equitable lien, of which she might be

totally ignorant, without giving her a day in court to defend her right or redeem her land? Such a principle would be most arbitrary and unjust; it is only by the application of such a principle that the complainant's claim can be sustained.

It may be asked how the territorial courts, having no chancery jurisdiction, could have proceeded against the widow? It may be answered, that if they could not proceed at all, the consequence would be rather that the widow should hold her estate than that she should lose it, without hearing or judgment. But if everything that was assets in the hands of the administrator had been 102] *exhausted and the debt not satisfied, a proper process might have been devised to subject the widow's dower, determining, in the first place, that it was liable, and in the next place, directing how it should be sold. A *scire facias* setting forth the whole matter, and calling upon the widow to show cause why her dower estate should not be subjected, might have been a proper course. Such a proceeding would have carried with it some semblance of justice, which is not the character of the doctrine contended for by the complainant.

Adopt this doctrine, and what is the consequence? The equitable lien is a secret circumstance known only to the creditor and debtor—other persons have no opportunity to obtain a knowledge of it. It does not appear upon the records of the court, or in the registry of deeds, nor in the terms of sale. The bidders never hear of it. They bid for the estate, subject to the dower incumbrance, and offer a price accordingly. If it be afterward discovered that the judgment creditor held a secret equitable lien, the purchaser may claim it as his own, and call upon a court of equity to set it up for him, in destruction of the widow's right—thus acquiring, through the aid of a court of chancery, a valuable interest in the estate, which was not contemplated at the time of purchase, and for which he paid not one cent of consideration.

Such, in the opinion of the court, is the claim of the complainant. He seeks—without the payment of a cent of money, or the performance of a single beneficial act to the estate by way of consideration, under pretense of an equitable lien, which, if it ever existed, he never owned, and which was long since extinguished—to wrest from the widow a valuable legal estate, vested in her by the death of her husband, in absolute right, without her ever

being made a party to the proceedings that thus annihilates her rights. An attempt of this kind ought not to receive the countenance, much less the aid of a court of chancery.

It is the opinion of a majority of the court, that as the complainant purchased the estate in question, subject to the widow's dower, her recovery leaves him in full possession of all that he purchased. As he has lost nothing, he can claim nothing of Talliaferro or of others. His bill must be dismissed, with costs.

Judge Burnet's dissenting opinion:

Having dissented from the opinion of the court, given in this cause, I feel it my duty to state the view which I have taken of the subject, and which has led my mind to the conclusion that the decree ought to have been in favor *of the complainant. In [103 order to do this intelligibly, it will be necessary to state the leading facts in the case. In May, 1797, George Porter, since deceased, purchased the land in question from Nicholas Talliaferro, and gave his bond for the purchase money. The condition of the bond specified that it was given on account of the land, and that the land should be held as a security until the bond was taken up. In August of the same year, Porter obtained a patent, and in April, 1778, intermarried with the defendant, Sarah Porter. In 1801 he died intestate seized of the premises, leaving the said Sarah, his widow, and W. I. Porter, his only child and heir at law. Peter Porter took letters of administration on the estate of George Porter. Talliaferro instituted a suit against the administrator for the balance of the purchase money not paid, and obtained a judgment in October, 1802, before the general court of the territory, for $1,125.16. On this judgment execution issued, and there being no goods and chattels in the hands of the administrator, the sheriff returned *nulla bona*, and that he levied on the land in question, being a part of the tract purchased of the plaintiff. The complainant became the purchaser at the sheriff's sale and obtained his deed in due form of law.

When the judgment was obtained, and when the execution was levied, there was no court of chancery within the territory. Sarah Porter has since set up a claim of dower, and obtained a judgment at law against the complainant, against which he prays to be relieved.

Many points are presented in the record, and have been discussed.

in the argument, but it appears to me the case may be settled by the examination and decision of two questions. *First.* Did McArthur acquire a legal title in the land in dispute, by his purchase at the sheriff's sale. *Second.* Was Talliaferro vested with such an equitable lien on the premises as will enable the complainant to hold them, free from the claims of the widow's dower, he having purchased at a sale for the satisfaction of the debt, which is alleged to have been a lien.

In deciding the first question, it will be necessary to look at the statute of 1795, which was in force when the action against Porter was commenced, and which is substantially the same as that of 1802. This statute was adopted from the Pennsylvania code, in which we find two statutes on the same subject, one passed in the year 1700, which was supplied by the other, passed in the year 1704. The governor and judges, who, it will be recollected, con-104] stituted the \*territorial legislature, under the first grade of government, adopted the latter act, the first section of which is in these words, "To the end that no creditors may be defrauded of debts justly due to them, from persons who have sufficient real, if not personal estate, to satisfy the same, all lands, tenements, and hereditaments, *whatsoever*, where no sufficient personal estate can be found, shall be liable to be seized and sold on judgment and execution obtained." This section is literally transcribed from the law of Pennsylvania, under which it has been uniformly decided that lands are liable to be sold on judgments and executions against executors and administrators, without the interference of the orphans' court, and without any previous proceeding against the heir. It was natural for the courts of the territory to adopt the rule of construction which had been settled in Pennsylvania, as the statutes were the same, and as their construction appeared to be reasonable, beneficial, and in strict conformity with the letter of the law. Accordingly, we find that the general court of the territory, in construing our statute of 1795, decided, in accordance with the rule established in Pennsylvania, that lands were liable to be taken and sold on judgment and execution against executors and administrators, in the same manner as in other cases; and such was the uniform practice under the territorial government. As the statute of 1802 did not make any substantial variation in the law, in this respect, the construction just adopted was continued, and the general court were in the constant habit of allowing and sustaining

110

such executions and levies; nor do I recollect of hearing the sound-ness of their construction questioned till after the establishment of the state government. That construction had been given to the law before I commenced practice, in 1796, and in the western part of the territory its correctness was not questioned.

But it was contended at the bar, that the decisions in Pennsyl-vania were founded on the law of the year 1700, which subjected "all lands of debtors to sale on judgment against them, their heirs, executors, or administrators." It appears to me that the defend-ants can not strengthen themselves by taking this ground, for two reasons. *First.* Because if the law of 1704 materially altered that of 1700, it must, so far, have repealed it; for, if they contain dif-ferent provisions, the former must give place to the latter—both can not stand. *Leges posteriores priores abrogant. Secondly.* Be-cause it appears easy of demonstration that the two laws are sub-stantially the same. The first subjects all lands of debtors to sale on judgments against *them, their heirs, executors, or ad-    [105 ministrators. By the second, "all lands, tenements, and heredit-aments, *whatsoever*, are liable to be seized and sold on judgments and executions obtained." The additional words, heirs, etc., in the first act, can not, under this provision, be more extensive than we find it in the second. The only difference seems to be, that the latter statute, from which ours was copied, subjects all lands to sale on judgment and execution obtained, without designating any case, not even judgments against debtors themselves, while that of 1700 enumerates the cases. Had the latter statute authorized the sale of the debtor's land on judgments against *him*, without further provision, the case might have been different; for then it would have been a fair inference, that having mentioned one de-scription of cases they meant to exclude all others; but having specified no case, and having made the provision broad enough to embrace every description of cases, they might well omit the words heirs, executors, or administrators as surplusage. Had it been their intention to give the statute a more limited operation than that of 1700, they would have selected such terms as were calculated to answer their purpose; they would have enumerated the cases which they intended to embrace, or would have excepted those designed to be excluded. But they have done neither. As they have omitted those words of the first case which relate to the debtor himself, as well as those relating to his representatives,

the conclusion seems to be inevitable that they were considered as surplusage, and that the provision, couched in the general terms of the latter law, was the same in its effects as the more special one in the former law. If it had been the intention of the legislature, by changing the language of the first act, to give the construction contended for by the defendant's counsel, they would have retained the general phraseology of the first law, omitting the words heirs, executors, and administrators; but as if for the purpose of excluding that construction, they have not only omitted those words, but have varied those preceding them so as to render the second act more general and comprehensive than the first. The correctness of this remark will be apparent to every person who will attend to the effect that would have been produced on the first act by the simple omission of the words heirs, executors, and administrators, and then advert to the further effect that has been produced by the alteration of the words in the preceding part of the section. But be this as it may, the courts of Pennsylvania 106] have decided either that the two laws are essentially *the same, or that the law of 1704, of which ours is a transcript, authorizes the sale of real estate on judgments against administrators, because their decisions have been made subsequent to the passage of that law, which must have repealed the former as far as it was inconsistent with it.

The first section of the act of 1802, under which Talliaferro's judgment was obtained, is in the following words : " The better to enable creditors to recover their just debts, all lands, tenements, and real estate shall be liable to be levied upon and sold by execution to be issued on judgments, which may hereafter be recovered in any court of record within the territory, for the debt, damage, and cost due and owing on such judgment." This language is as general as words can make it. It embraces without exception all creditors, all debts, all real estate, and all judgments, and it requires nothing but the judgment and execution to authorize the levy and the sale. There is nothing in the act that excludes judgments against administrators, or that requires any step to be taken, after judgment, and beyond execution, in order to justify a levy and sale. If land may be taken and sold by execution on any judgment, it may certainly be taken on a judgment against an administrator, as the law makes no distinction. An application to the orphans' court, or a scire facias against the tertenants, is not

112

required, nor is it believed that any important benefit would result from it, to countervail the delay and expense that would certainly follow. It would have been easy to shape the law so as to have made but one or the other necessary. The law subjecting real estate to execution for debt, and the law for the settlement of intestate estates, have no reference to each other. They are distinct statutes, intended for different purposes. The former authorizes a sale by execution where there is a judgment, without the agency of the orphans' court. The latter authorizes a sale by the orphans' court, on the application of the administrator, without the agency of the creditor. The one puts it in the power of the creditor to effect a sale where the administrator does not choose to act. The other enables the administrator to proceed and settle the estate where the creditor does not see proper to act. The remedies appear to be concurrent and independent; neither seems to require or exclude the other. In the one case the court before which the judgment is obtained will protect the rights of all persons concerned. In the other, the orphans' court which grants the order of sale, will perform the same office. As I can not perceive any particular advantage that would be gained by *requiring the judgment [107 creditor to apply through the administrator to the orphans' court for an order of sale, and as such a course is not required by the letter of the statute, there appears to.be no sufficient reason to induce a court to require it. The difference that exists in the nature and extent of the lien which creditors have in this country and in England on the lands of their debtors, is sufficiently striking to show that many of the formalities that are considered necessary in that country are not so in reality in this. In England the personal estate is the fund for the payment of debts, and for that purpose it goes as assets into the hands of the administrator, while the real estate descends immediately to the heirs, unincumbered with any lien that will justify the creditor in meddling with it, without a previous judgment against the heir. But not so in this country; here lands are assets to the same extent as chattels, and the only difference is, that the personal property must be exhausted before the real estate is resorted to. In England the liability of land to the claim of creditors is partial and limited. Here it is general and extends to the whole interest of the debtor. There was not, therefore, anything incongruous or improper in the principle recognized by the legislature, and adopted by the court

in the construction of this statute. At all events it must be con-
ceded that the phraseology of the law admitted of the construction
given to it, without violating any principle of common law that
had been recognized or adopted in the territory, although other
judges equally learned might have been disposed to give it a
different construction. It will also be admitted that the general
court of the territory had a right to settle the construction of stat-
utes, and that their decisions should be considered as the law of
the land. In 1 Blac. Com. 69, it is said to be "an established rule
to abide by former decisions where the same points come again in
litigation, as well to keep the scale of justice even and steady, and
not liable to waver with every new judge's opinion, as also because
the law in that case being solemnly declared, what was before un-
certain and probably indifferent, is now become a permanent rule,
which it is not in the breast of any subsequent judge to alter or
vary from, according to his private sentiments." The only ex-
ceptions to this rule are where the former decision is evidently
contrary to reason or the divine law. The Supreme Court of the
United States have recognized this rule, and have uniformly ad-
hered to the construction given by the superior courts of the sev-
eral states to their own statutes. In the case of Telfair *v.* Steads,
Ex'r, 2 Cran. 418, that court adopted the construction given by
108] *the courts of Georgia, to statute 5 George II., by which
construction lands were made chargeable for debts in the colonies
without making the heir a party. In the case of McKeen *v.* De-
lancy, lessee, 5 Cran. 32, although the Supreme Court of the United
States considered the construction given to an act of Pennsyl-
vania by the Supreme Court of that state, to be incorrect, or such
a one as they would not have given had the question been pre-
sented for the first time, yet they adhered to the construction
given by the state courts, observing that in construing the statutes
of a state on which land titles depend, infinite mischief would en-
sue should they observe a different rule from *that* established in
the state. The same doctrine is held in Higginson *v.* Mein, and
Pollard, etc. *v.* Dwight, etc., 4 Cran. 418, 429. In 2 Blac. 264,
it is said, where an error is established and has taken root, upon
which any rule of property depended, it ought to be adhered to
by the judges, till the legislature think proper to alter it, lest the
new determination should have a retrospect and shake many
questions already settled.

114

It would be highly improper for this court to disregard the construction given by the general court of the territory, to the statute in question, for many reasons. 1. The statute was adopted by them, and by their authority received its obligatory effect in the territory; they must, therefore, have known what they intended by the law. 2. The same construction had been previously given in the State of Pennsylvania, to a statute substantially the same. 3. By disturbing that construction much mischief would ensue, and many titles would be put in jeopardy. And lastly, as the statute has long since been repealed, there appears to be no necessity to alter or vary the rule, should it even be admitted to have been an improper one.

On the whole, I am led to the conclusion, that the statute authorized the levy and sale which were made in this case, and that the complainant, by his purchase, has acquired a legal title to the premises in question. On this point, however, I believe there is no material difference in the opinion of the court, though I am not authorized to say there is a perfect coincidence.

The next inquiry is, whether Talliaferro held such an equitable lien on the premises as will enable the complainants, by virtue of his purchase, to hold them free from the claim of dower? In considering this question, we are naturally led to inquire, whether Talliaferro held a lien—whether that lien is superior to the widow's dower—and whether the complainant, as a purchaser under the sheriff, is entitled to the benefits of it, to the exclusion of the right of dower?

*The rule seems to be well settled, that the vendor has [109 a lien on the premises for the purchase money, unless he agree to relinquish it and rely on other security. Proof of such agreement must come from the purchasee; for, in the absence of such proof, the lien is considered as existing. The death of the vendee does not affect the lien, nor is it destroyed by giving an obligation for the purchase money, or by the payment of a part of it, and it exists in favor of an assignee. See 3 Eq. Cas. 682; 1 Vern. 267; 3 Alk. 277; 2 Ves. 622; 1 Johns. Ch. 308; and other cases there cited. So far from there being any agreement on the part of Talliaferro to abandon his lien, it appears, from the condition of the bond, that he relied on it, and that Porter understood and agreed that the land should be bound till the bond was discharged. The existence of the lien being ascertained, we are

to inquire whether it excluded the widow's dower ? We find that the purchase was made in 1797, and the marriage took place in 1798—consequently the lien existed before there was any pretense to the claim of dower. The right having once vested, it was not in the power of the vendee to alter or abridge it by any act of his own, so long as the purchase money remained unpaid. Such a power would be altogether inconsistent with the nature of the right, and would destroy the value of the security. A lien held at the will of him on whose land it attaches and whose estate it incumbers, would be a novelty in legal proceedings. It would form a species of security as useless as it is unknown. In fact, the idea of such a power is inconsistent with the existence of the lien, and amounts to a declaration that the lien was never in being. The law, by making this provision in favor of the vendor, intended to give him a beneficial security, and if so, the permanency of that security must be placed beyond the control of the vendee.

In principle, there is no difference between a privilege to destroy the right in part, or to abolish it entirely. We can prescribe no limit to the exercise of such a discretion. But it is apparent that the vendor had a right to hold the entire estate in security. The law gave him an equitable mortgage, and it must protect it. I, therefore, conclude, that as the lien extended to the whole of the land, it was not in the power of the vendee, by any transaction or contract of his own, to relieve a third or any portion of it from the operation of that lien ; and whatever might be the decision as to the widow's claim, when prosecuted in a court of law, in this court it must yield to the prior equitable claim of the vendor. The doc-110] trine *of notice, it is conceived, does not apply to a case circumstanced like the present. The widow does not stand on the ground of a purchaser, for a valuable consideration without notice. She comes as a participator in the rights of her husband, as they stood at the time of her marriage; and as far as those rights were incumbered, she must be affected by the incumbrance. Her claim is legal, not conventional: it would, therefore, be doing violence to the laws—it would raise it above itself—to give it the double operation of divesting the widow of a settled right for the arbitrary purpose of vesting it in another. On the same principle, a legal mortgage would give way; but I believe that the law, in settling the rights of the widow, has had a scrupulous regard to the rights of others. Hence we find many cases in which her claim yields

to the superior equitable claims of others; as, for example, if her husband exchanges land with another person, she can not be endowed of both tracts, although her husband was seized of an estate of inheritance in both during coverture, because it would be unjust and would operate injuriously on the rights of others. And for the same reason, if her husband, being seized in common with another person, make partition, and that person be evicted for want of title, she shall not have her dower in that part of the land which his co-tenant may recover *pro rata*. 2 Bac. Dower, B. 4; F. N. B. 150. So, if her husband were seized of a joint estate and died, she shall not be endowed on account of the survivorship, for the survivor claims from the grantor, which is prior to her title of dower. So when a vendee, at the time of receiving his deed, executes a mortgage to the vendor to secure his purchase money, the wife of the vendee is not entitled to dower; for although her husband was seized, it was but for a moment, and it would be inequitable to support the claim in opposition to the clear understanding of the parties, by which the deed and mortgage are to be considered as parts of the same contract and treated as though they had been embraced in one instrument of writing. 2 Co. 77; 15 John. 459; 4 Mass. 560.

In Winn *v.* Williams, 5 Ves. 130, the master of the rolls decided, that a purchaser or mortgagee might protect himself against a claim of dower by taking in a mortgage executed before the marriage, "although the consequence will be, utterly defeating the right of dower."

The decisions by the courts of the different states, on this point, have not been uniform. In Massachusetts it has been settled that a widow is not dowable of an equity of redemption generally. 10 Mass. 364.

*In Pennsylvania, the widow is dowable of land mortgaged [111 before marriage, but the right is subject to the mortgage. 2 Serg. and R. 554. But a sale on a *levari facias*, on a mortgage, will bar the right of dower, though the mortgage were executed during coverture. Scott *v.* Crosdale, 2 Dall. 127; 4 Dall. 301, note.

In New Jersey, dower can not be claimed of land mortgaged before coverture. 1 South. 260.

In Connecticut, Maryland, and New York, a widow may be endowed of an equity of redemption. 1 Conn. 550; 7 John. 282.

In North Carolina, it has been decided that a widow is entitled

to dower only of such lands as the husband died seized of, and consequently that an alienation by the husband alone, during coverture, is a bar to dower. 1 Hayw. 243.

In Virginia, a mortgage by the husband during coverture does not bar dower, unless the wife join. 2 Munf. 527.

In South Carolina, the court said, in Wells *v.* Martin, the right to dower had a preference to mortgages or any other incumbrances made or suffered by the husband in his lifetime. 2 Bay. 22. But the reporter, in a note to Bogie *v.* Rutte, etc., 1 Bay. 312, says, that it has been repeatedly determined in the courts of that state, that "widows of mortgagors were not entitled to dower."

In Kentucky, the widow may be endowed of any beneficial interest of which her husband was seized during coverture. In the case of Winn, etc. *v.* Elliot's widow, etc., Hard. 488, which was a bill in equity to bar the widow of her dower, the husband had, during the marriage, a beneficial interest: he had acquired the legal title, and he died seized in law, whereby, said the court, the wife's right to dower became complete at law, and they decided that her claim should not be ousted by an equity against the husband *derived during the coverture*, and from the husband : nor should it be defeated by showing a title not derived paramount to the husband's, but under it; nor *by an equity that did not commence previous to the wife's*, but subsequent thereto.

In Ohio, it is admitted that the widow is dowable of lands mortgaged or aliened by the husband during coverture, if she do not join in the mortgage a deed of conveyance. And it has been decided, in the case of Ewing *v.* Stansbury, that she shall be endowed with reference to the value of the premises at the time of the alienation.

But it is confidently believed, that no court in the United States has decided that a widow is dowable of an equity of redemption, 112] *where the mortgage was executed before coverture, without the qualification that her right is subject to the mortgage. In the case of Collins *v.* Torrey, 7 Johns. 283, the court say : "The plain and necessary rule is, to allow her the dower, which she must take, as the heir or the purchaser takes the estate, subject to the mortgage."

It only remains now to inquire, whether the complainant, in consequence of his purchase, is entitled to the benefit of this lien ? We have seen already that the lien continues in favor of an as-

118

signee; but whether the complainant be considered in that light or not, as a purchaser at a sale legally made to raise the purchase money for the benefit of Talliaferro, he must be entitled to the same consideration that Talliaferro would have been entitled to had *he* became the purchaser—otherwise the value of the lien would be measurably lost. It was immaterial to Porter who purchased. If the land were bound for its price, to the exclusion of the title to dower, it must remain so in the hands of the complainant; for if the right of dower did not attach prior to the right of sale, it certainly could not be created by the sale. If there had been a court of chancery in the territory, and if Talliaferro had filed his bill and obtained a decree for a sale, the estate in the hands of the purchaser could not have been liable to the widow's claim. But as there was no such court, and the vendor was under the necessity of proceeding in a court of laws, it would be unreasonable to say that he shall lose his security, which would be the case, in part at least, were the purchaser to take the property subject to dower, as with that incumbrance it could not be expected to command its value.

This case, in principle, may be likened to a procedure on a legal mortgage, by *scire facias,* under our statute. If the mortgage be executed before the marriage of the mortgagor, the claim of dower yields to the lien of the mortgage, and the purchaser at the sheriff's sale will hold the premises, to the exclusion of that claim, because the lien is prior and superior to it.

In the case of Garson *v.* Green, 1 Johns. Ch., the decree was against the widow and heirs at law, for a sale of the premises without any reservation. It, therefore, seems to have been considered by the chancellor that the right of dower did not exist, and that the purchaser would take the premises free of this incumbrance.

From the view that has been taken of the subject, it appears to me that Talliaferro had a lien on the land which must be treated *as an equitable mortgage, and which secures the land for  [113 the payment of the purchase money, to the exclusion of subsequent incumbrances, and consequently that the right of dower in this case was subject to the lien, and can not be set up till the debt is satisfied.

The objection that the proceedings were had in a court of law, seems to be obviated by the fact there was no court of equity

119

in the territory, and that under such circumstances courts of law will give the same relief as courts of equity, provided the forms of their proceeding will admit it. They can not enforce a specific performance, or compel a disclosure by the parties themselves, but wherever an equitable right can be presented, investigated, and decided in a form of action used by them, they will not hesitate to do it, and will enforce their decisions by any form of execution known to the law, and calculated to accomplish the object. Such was the fact in the case before us.

Is it objected that the widow was not a party in the proceedings at law, and therefore has not had a day in court? Neither is she made a party in proceeding on a mortgage, by *scire facias*, under our statute, although her rights are affected in the same manner and to the same extent. But she is now a party, and the merits of her claim are fully before us. If those merits have not been decided, and if, as has been urged, the proceedings at law have not concluded her, because the lien was not legal, but equitable, it would seem that the parties, being now before a tribunal of sufficient power, a final disposition may be made of the cause, by which the objection that the widow has not had a day in court would be removed. Should it be admitted that after the proceedings in the suit at law, and the subsequent establishment of a court of chancery, the widow might enforce her claim to dower, at common law, against the complainant, and that his defense, being an equitable one, could not there be heard, the admission would not affect the question, unless by showing that the remedy in the territorial court, for the want of full chancery power, was not complete, and that the aid of this court was necessary to perfect it. The admission would not affect the existence of the lien, or its operation on the claim of the widow, it would only show that a court of law would not continue to protect an equitable right after the establishment of a court of equity, and that this bill was necessary to quiet the complainant and relieve him from the claim at law. If the proceedings in the territorial court did not completely silence the widow's claim at law, the only resource for relief was to a court of chancery.

114] *Should it be admitted in the broadest terms that the proceedings in the general court have had no bearing on the equitable lien of Talliaferro, or on the legal claim to dower, it would follow that the lien is yet to be enforced, and this is certainly the proper tribunal to do it. To render a mortgage operative, it is not necessary

for the mortgagee to become the purchaser of the mortgaged prem·
ises. Should a third person purchase, at a sale to satisfy the mort-
gage, it must operate to protect him against after incumbrances, to
the same extent that it would have done the mortgagee, had he been
the purchaser, otherwise the mortgage would be of but little use,
I do not therefore see the propriety of the conclusion, that because
Talliaferro was not himself the purchaser, the lien has been dis-
charged, and the complainant must be liable to an incumbrance that
Talliaferro might have avoided had he purchased himself. If the
lien existed, the whole object of it was to enable the vendor to
have the land sold for the payment of the purchase money, free from
subsequent incumbrances, and I consider it a matter of perfect indif-
ference by whom the premises were purchased. If in this case
the claim of dower is to be sustained because the mortgaged prem-
ises have been purchased at the suit of the mortgagee, and pur-
chased by a stranger, at a price sufficient to satisfy the debt for
which they were bound, on the same principle the claim of dower
must be good in every case where a third person purchases under
a judgment by *scire facias* on a mortgage, for a sum sufficient to pay
the debt.

Whether McArthur relied on the lien or not, is a matter not
known to the court, nor do I consider it material, as a man may be
ignorant of his rights without forfeiting them.

On the whole, it appears to me that the equity of the case is with
the complainant.

